Good morning. May it please the court, Thomas DeCiani on behalf of the defendants Adam Gibson, John Summers, Tina Dreyer, Robert Copley, all City of Quincy, Illinois police officers. I will be speaking for four minutes of this initial presentation and then counsel for the co-defendants will speak for two minutes and then I would reserve two minutes for rebuttal. So can I start you off right away on something that's troublesome to me? This case is here properly, if at all, as an interlocutory appeal on qualified immunity. But looking at the district court judge's extremely lengthy opinion, I don't see qualified immunity. Qualified immunity may be raised for the Brady side of things, which is, as I understand it, now abandoned anyway by Mr. Lovey on behalf of his clients. And the rest of this looks like summary judgment being granted or denied. So I'm looking at the conclusion on page 104. There's a small grant of summary judgment for your clients with respect to Mr. Lovelace and Logan's intentional infliction of emotional distress claims. The rest of the claims, the court denies summary judgment. Well, there's no interlocutory appeal from the denial of the summary judgment. That's a non-final order. And I don't, you know, if you could direct me to a page in the court's opinion where it says, now I'm turning to the Quincy defendants assertion of qualified immunity or something like that on something other than the Brady claim. Basically on what I'll call the Manuel claim. I just, I can't find it. Well, you've hit me with a surprise. I'm sorry. I have to say. I think the qualified immunity arguments or rulings take place. So if you go to page 79, for example, defendants argue that they are entitled to qualified immunity from plaintiff's Brady claim. Okay, fine. You know, especially since that claim is gone, you know, we don't really have to worry about the claim. What I don't see after this section, there's a long discussion in this section about failures to produce exculpatory evidence. That all sounds like Brady to me. And I don't see anything about unjustified detention for lack of probable cause. Well, I am certain that we raised the question of qualified immunity on the wrongful detention claim. If the court didn't pay specific attention to it in the ruling, I think by implication, at least, that's been a denial of our qualified immunity on that point. There's a related, if I could follow up on that, it seems to me there's a related problem here. First of all, in your brief, you attack the district judge's reasoning for having misread the record. That is quite clearly, as I understand appellate jurisdiction here, something that we do not have the power to consider at this point. That kind of an argument is beyond the scope of what we can consider. And we have the district judge finding quite clearly that probable cause for arresting and detaining Mr. Lovelace depends on disputed facts. How do we have appellate jurisdiction to consider that issue, which is what you seem to want us to focus on? We do. And what we are arguing and raising before the court is only the undisputed facts, which we contend makes this a question of law. But how can you be doing that when, I mean, I had the same issue. It's a Johnson against Jones issue where you have to take all of the facts. If you're going to try to do that move, which is possible, if you will take all of the facts, as Mr. Lovelace contends they are, but that means he sees her at 8.15. It means the children see her that morning. It means that the EMT moved her arms. I mean, there's just a slew of things that you are contesting and, you know, not resolvable by this court for sure. There are undisputed facts that determine that this was a homicide. I don't see them. I see disputes right and left about whether this was a homicide. Including even whether the pathologists that the prosecution relied upon had gotten reliable facts from Gibson and Keller. Well, you're talking about Dr. Denton and his. I'm talking about Denton and I'm talking about Turner as well, where the critical assumption is that Mrs. Lovelace was in, quote, full rigor. And we've got lots and lots of evidence that she wasn't. Exactly. We have evidence that her body was still warm to the touch, that her forehead was warm to the touch, that it was possible to move her arms above her or up to her shoulders for the EMTs. That's not full rigor. Well, Dr. Turner's report 93-20 and the docket number 93-20, I think, says it pretty convincingly that what she looked at, she looked at police reports, seen photographs, autopsy report, autopsy microscopic slides, autopsy photographs, death certificate and email correspondence between the police and Dr. Bowman. And those are the earlier email correspondences. And then she looked at autopsy photographs. And in her deposition, she made very clear that that question of, quote, full rigor was decisive. Well, and she found it to be full rigor, not based on. It wasn't there. She wasn't looking at it, and it's inconsistent with other evidence in the record. Maybe upon a full trial, maybe somebody would decide to overlook, you know, the lack of information she had about certain things. I don't know. But full rigor is inconsistent with a warm body where you can move the arms up to the shoulders without any trouble. Full rigor is very stiff. Well, yes. But Dr. Turner's thought of based on what she described as objective evidence in the report. But we don't have to believe that. A jury wouldn't have to believe that if there's other evidence in the record. But we're talking about probable cause. And this probable cause, it should meet that standard. Now, is the court under manual going to say that whenever there is one expert witness who disagrees with another expert witness or there's an expert witness who has. There are disputed. That is not the issue presented on this record. Right. The issue presented on this record is that Gibson and Keller skewed the information provided to Turner, to Denton, and others. Yes, but it wasn't. And the question we have is. And that's why it's a Manuel question. Jurisdiction. That's the Manuel claim. And the question is whether we've got jurisdiction, in essence, to fully evaluate the district judge's evaluation of this extensive record. In concluding that the question of probable cause depends on disputed facts, including these communications between Gibson and Keller on the one hand and the other. The pathologists on the other. But, I mean, this court you have held repeatedly that there can be disputed facts and you would disregard the disputed facts and look at the undisputed facts to determine if they establish the low bar. Not when there's a question of falsification and misrepresentation. That's exactly what Manuel is about. You know, if somebody is being detained based on what is actually a lack of probable cause once you have examined those flaws in the information. I understand. And that's what's disputed here. You, of course, are taking a position that there were no such things. And your opponent says, yes, there were these problems. I think Dr. Turner's report. And there were two other experts who testified as well. But Dr. Turner's report eliminates any of this subjective information. No, it doesn't. It's based on a flawed basis, allegedly. I think it's enough for probable cause, Your Honor. And during her testimony at trial, she was even more explicit and emphasized that she wasn't looking at anything or considering anything subjective. She looked at records. She looked at photographs. She looked at autopsy reports and autopsy photographs. And all of her opinion was based on that. And the other two experts as well. This is not like the Stinson case or the Tenth Circuit case that the other side has cited in which the police actually provided information that the experts relied on, which was false. Look, there were only a few people who saw her in the house at the time the authorities show up after her death. And then she's in the funeral home. There's another investigation. But she's cremated not very long thereafter. So there's only a very finite set of data on which anybody can rely. It's impossible to do blood tests, to find out her alcohol. It's impossible to do a great number of things. But anyway, I think speaking personally, I have your argument. Well, my time is up. Thank you. Thank you, Counselor. Mr. Hanson. Thank you, Your Honors. James Hanson for Coroner Keller. As to the probable cause, I want to dive into that as it relates to my client. What the appellees have argued and have steadfastly stuck to is that Coroner Keller fabricated evidence in the form of the statement he gave as to the rigor of Ms. Loveless's body at the scene. Mr. Keller, as Your Honor has stated, was one of the few who was at the scene and a part of the original investigation. For about five minutes, as I recall. Correct. He was the Assistant Coroner, Assistant Coroner Hamilton at the time. However, the probable cause goes to what Officer Gibson had and what was presented. I think a distinction here for Coroner Keller is we are not stating and have not stated that he didn't state what that is. Meaning, he's not taking the position, I wasn't there and he was. Or, I was there and I wasn't. We have never disputed the fact that he said what he said and he testified to the position of the arms and what he found at the scene. Well, you can see the position of the arms in the photographs. True, true. Exactly. And I would state, Your Honor. And somebody moved them that way, though, is the evidence that came out. The EMT who was trying to revive her, who could not have moved them like that if she had been in full rigor mortis. Well, I think what's important for the probable cause analysis that is for this Court to decide is it is a low bar and what is the totality of what was information that was known. What did not change throughout this whole proceedings from investigation one to investigation two is the report of Jessica Bowman. You still had her concerns on an undetermined cause of death. With all that pressure to change to say homicide, which she won't do. But what you also have is you have the testimony of the children that they saw their mother that morning. They all say that. And you have Mr. Lovelace's testimony about the timeline. You have the fact that the EMTs have been able to move her arms. You have, you know, the fact that he's off there taking the kids to school. I mean, you just have a lot of this record is replete with factual messiness, you know. And it seems to me under Johnson or for that matter, as I'm saying, I can't even find, you know, a proper motion to get this dismissed on any kind of qualified immunity. So I'm not even sure we have jurisdiction. Well, I went and looked and I think the district court started an analysis on that on page 54 maybe. But I'll be honest with you. I didn't have time as I was listening to try and continue. This is about summary judgment. Defendants are not entitled to summary judgment on Mr. Lovelace's claims for unlawful pretrial detention. So district judges can entertain a motion for summary judgment or they can entertain a motion to dismiss based on qualified immunity. But they aren't the same thing. I understand, but I think we raised the qualified immunity. I didn't look honestly in the time here for a page in the brief and whether Judge Myerscoff addressed that or not. She doesn't address it. Now, maybe it's in a motion of yours that I wasn't able to find, but she doesn't address it. She addresses the merits of a summary judgment motion and denies summary judgment. Sure, but I think, okay, let me step back. The qualified immunity is a proper interlocutory appeal. If there's a ruling. Correct. I agree. I agree. Correct. Yes, correct. So I understand your point. One other thing I want to loop back in on the probable causes, but, again, it's what is in the reasonable minds of and the information that was there, which was many things. So I want to get to the point of it. And what she says on page 60, based on the evidence presented, discussed in more detail below, Mr. Lovelace has brought forth sufficient evidence to create a genuine issue of material fact whether probable cause existed to detain Mr. Lovelace. So you have to tell us why that's wrong. I mean, then on page 61, she says, Therefore, the court denies the motion for summary judgment as to plaintiff's Fourth Amendment Manuel claims against Gibson, Copley, Summers, Dreyer, Keller, and Farha. So that reads to me like a merits ruling. And my statement, my position is, as stated in the brief, as to Keller, the ---- It was one of the names she mentioned. Yes, correct. I just read. And now I lost my train of thought. I apologize. I was on the probable cause argument and ---- No, you're saying that there's probable cause evidence in the record, I realize, but you're swimming against what the district court found. Yes, and what I'm saying is Keller gets the qualified immunity because the probable cause is, it was not an issue of fact as to Keller. We are not, there is not an argument that Keller is putting forth that they're saying he did or didn't do something. That's what I'm saying on the fabricated, their fabricated evidence is he said this. We agree he said what they're stating. But the probable cause argument goes to his fabricated statement. If you take what they say is true, it didn't change the probable cause, and it wasn't the only thing that was presented. There was probable cause presented from multiple things that goes to what was in the mind and reasonable knowledge of Officer Gibson, which is the Bowman investigation pathology report had not changed. You had Loveless' behavior that had not changed. You had the photographs that had not changed. That's what I'm saying as it relates to coroner Keller. Okay, all right. Thank you. Thank you, counsel. Thank you. Mr. Loewe? May it please the court, John Loewe for the plaintiff Mr. Loveless, and we agree that this is fundamentally a no jurisdiction qualified immunity appeal. The court is not supposed to be resolving issues of fact. Your Honor raises a good point that if they didn't preserve it by raising it, then it isn't even properly before the court. You think they did? Excuse me, Your Honor? You think they argued qualified immunity on the Manuel claim? Your Honor, that has caught all counsel unaware. I've gone back and looked as well, and I would agree that it's not in our brief. I have our summary judgment brief here. We didn't respond to it, which suggests it wasn't raised. It certainly wasn't in the district court's opinion. I did not hear either of my opponents claim that it was raised. So I don't want to misspeak and say it wasn't raised, but all inferences are that it wasn't raised. And if it wasn't, that is the end of this appeal. But even if it was raised. Well, could I just say that perhaps if both counsel wanted to take a more considered moment to search the record, and just by letter would be enough to inform us of what you find, that would be helpful? I think that's a very good idea, and that's what we'll do. And of course, even if it had been raised, they still lose and they still lose on jurisdictional grounds because there is a disputed fact. That's not the kind of thing this court resolves on an interlocutory appeal because it does turn on disputed facts. I'll ask Judge Wood if we gave both counsel a week to . . . That should be enough. That should be enough. We'll have a week to send a communication to the court indicating that it's a qualified immunity issue. Thank you, Your Honor. Mr. Lovey, is there a trial date currently scheduled? Not to my knowledge, Your Honor. So just sort of summing up the facts, we are fortunate to live in a country where there is a remedy when state actors, unlike the federal actors we heard about this morning, violate someone's constitutional rights and cause them an unjust imprisonment, and they really made a mess of Kurt Lovelace's life. His wife died a death of natural causes, and when you analyze probable cause, you have to . . . you can't just ignore information. And the information was this, unfortunately, this woman drank herself to death, and there was a thorough investigation. There was no sign of any struggle, no sign on her body of any trauma. The detectives looked. The coroner looked. No injuries. The autopsy was unable to conclude it was a homicide. Basically, at the conclusion of the investigation, there was no probable cause to believe . . . Was there some testimony about something around her mouth? Right. What they found was on the inside of her mouth, there was an older healing cut. So if you're going to smother somebody to death with a pillow, you would expect to see some injury because it's a violent struggle, and her face had no injuries whatsoever. They did find an older healing cut, but as Dr. Denton told Keller and Gibson in an email, it's not a cut from when she died because it had already begun healing, and a dead person doesn't heal. So that cut was a red herring. They knew it was a red herring, and they suppressed the emails that informed them that it was a red herring, and then they misled not only Dr. Turner, but the prosecutors. So there was no evidence of any struggle. The case was closed. Experienced homicide detectives determined that there was no probable cause to believe that there had been any homicide, much less that Curt had done it. Seven years passed, and you know what might not have been clear from the briefs, this pillow theory, because it sort of dropped out. So let me just give your honors a little context to how this happened. The photo shows this woman with her hands sort of seized up like this, and Detective Gibson's canine had died. So he became a detective, and he's looking at old cases, and he comes to this hypothesis. I bet this photo shows a woman who got suffocated with a pillow underneath her seized arms, and then somebody left her there for nine hours, and her arms froze in rigor, and then they pulled the pillow out. That was his hunch, and that's where this whole thing went wrong. Turned out her arms had been moved, so the whole thing was off. It also turns out that arms freeze in all kinds of positions. There's nothing unusual about it. But Gibson wasn't taking no for an answer. He wanted to prove to his bosses he could do this. He kept telling them that the evidence is coming back great. We're doing this. He devoted months to it. He struck out with doctor after doctor after doctor. Pounder told him there's nothing wrong with this picture. The pathologist who performed the autopsy said, I see no evidence of a homicide. They couldn't flip her. Dr. Denton said, look, the cut in your mouth is irrelevant. It's a healing cut. I'm very troubled by her liver. You know, when people are alcoholics and they don't eat, because she had an eating disorder. Right, but Denton, in terms of probable cause, though, I would think Denton's maybe your biggest problem, because while he acknowledges those facts, he does wind up giving them an opinion of suffocation, doesn't he? Well, suffocation, just to be clear, is an opinion that can't be proved or disproved, because all dead people stop dying, stop breathing. So when you find a dead person who's not breathing, you can't rule out they've been suffocated. What was missing from this woman's body were the blood vessels in her eyes hadn't been popped. There was no evidence of a trauma. There was no indication whatsoever that she had. I know you want to argue with that and have good arguments on the merits that Denton was wrong, but didn't he say that? Well, he didn't, Your Honor. His first opinion to them was, I'm not going to make that opinion in court because I can't rule out natural causes because I'm very concerned about the disease, state of her liver. He also said, what you're calling trauma is not trauma. And then he got interviewed by the defense attorney, Mr. Page, and he told them, I'm not going to testify in this case that it was suffocation. I'm not going to go to court and say that because I can't rule out natural causes.  over and over in meeting with the prosecutor, they told the prosecutor, oh, Denton's saying suffocation, Denton's saying suffocation, when in fact Denton had written them an email suppressed improperly by them that said, you'll never get a conviction in this case unless the pathologist changes their opinion. No jury's ever going to convict. So Denton may have, as he put it in his email, done it as a favor to support Keller, who was sending him autopsies, making him money. He wanted to remind him that, hey, I'm doing you this favor. But he did not go in writing with a report saying that it was suffocation before Kurt's arrest. I think that's a really interesting fact. They kept telling the prosecutor that was coming. Denton never did do the report. He never wrote a report. He wrote a report seven months later. And in it, he said, hey, the reason I'm going to say it now is because Gibson told me the kids changed their story. Denton said, well, that's new information. If the kids didn't see her that morning, then maybe Keller's not lying about this rigor memory, that now we got something. And by the way, what do pathologists do? When they make cause of death, they're not God. They've got to infer. So they're saying, well, if the kids changed their story, well, then maybe the rigor and so on, I'm going to look at the whole picture. But that was a lie. They lied to Denton. Not only had they not changed their story, but they hadn't even been interviewed. And on summary judgment, they say, well, Denton made a mistake about that. So they lied to Denton, they lied to the prosecutor, they lied to Turner. You can't manufacture your own probable cause by fabricating. The kids did not change their story. The interesting fact in the case is they got interviewed seven years later without any preparation because they got pulled out of school, and they got asked and they said the same thing. It was Valentine's Day. We remember our mom came downstairs, helped us with the Valentine's project. They're not lying. And the jury doesn't have to conclude that they were lying. The jury can conclude that the fabricators were instead Gibson and Keller, who misled Turner and the only suggestion I heard that gave me any pause was the suggestion that there's objective evidence that Turner relied on. She looked at some photographs of a dead woman. You can't tell from looking at that photograph that she got suffocated. There's no injury on the body. All we know is she's not breathing. She had a pretty good look at the eyes. The eyes are... And the blood is pooling underneath her. That is true, and it is undisputed that you cannot time time of death by dehydration because first of all, when you're sick, you're dehydrated. She was only drinking alcohol. She was dehydrated. And all the experts, including Turner, admit you don't time death by dehydration because there's such a wide range. It can measure on the temperature of the room, the dryness. So that is not a way that you date death. That's not a thing. And all of the doctors said, look, you got a range of dehydration. There's nothing abnormal about this dehydration. We have a person who's been dead for a couple hours. There's some dehydration started. Normal, normal, normal. So there's no objective evidence that she'd been dead longer. And certainly, you know, is that the tiniest fact they can say is like, oh, maybe it's a little more dehydrated than we would have expected. You can't ignore all the other evidence because what does the dehydration get you? They're trying to prove that she was killed the night before and Kurt left her in the bed, but they can't ignore it. But their argument seems to be, yes, maybe there are a bunch of facts on your side, but probable cause can be supported just by a one-sided presentation. And, you know, oftentimes that's an interesting question, although the law is, if any, you know, the law is quite clear that we leave it to juries. Probable cause is fact-intensive. If there's any reasonable argument, the jury should get it. What's interesting about this case is there's no facts supporting probable cause. There's nothing. You know, this woman died a natural death with no signs of struggle on her body, and there's absolutely nothing to suggest she was murdered, much less that Kurt did it. So, I mean, we can argue that legal principle, but the fact is there is no probable cause to believe she was killed, because she wasn't. She died a natural death. So the jury, you know, that's my argument. The jury will decide, but this is not a qualified immunity case. Thank you. Thank you, counsel. Mr. D., can I give you your two-minute rebuttal that you had? Thank you for the extended time. I want to address the last point that counsel talked about, saying that there was no objective findings that this was a homicide. And I'm going to quote directly from Dr. Turner's report. And it wasn't just photographs. It was a lot of autopsy findings. It was autopsy photographs. And she says there was marbling on the external surfaces by the time of the autopsy examination, the staining of the intima of the aorta by hemolyzed blood, the changes of autolysis of the spleen, and the development of postmortem ethanol in the blood, evidence that the ethanol concentration tested in the blood is a postmortem artifact rather than ingested ethanol in the absence of ethanol in the vitreous and urine. These are objective findings based on autopsy conclusions. But they're not incontestable. This isn't the sort of thing that the weather outside in Chicago today is 46 degrees. At best, I think you have facts that may show a dispute of fact, but we can't resolve disputes of fact if that's what... That was actually the context of Johnson v. Jones. It was a summary judgment ruling, and the court says you can't make an exception on qualified immunity for finding disputed facts. Well, I thought your question to counsel actually answered that point in that you can base probable cause on a one-sided version of the... If there's been no tainting by misrepresentation... There's nothing in Turner's report that suggests any tainting or any type of... Well, we're looking at the record as a whole, of course. Well, all right. We certainly owe you the response regarding the question, and we will do that. And the other point I would make, if I can have just a few more seconds, the court certainly had jurisdiction to consider the due process claims, and the counsel has conceded those. We would certainly ask that the court doesn't throw the bat... If you find no jurisdiction, you don't throw the baby out with the bathwater, and you enter an order, so it's law of the case, that the due process claims are reversed, and summary judgment needs to be granted on those. Assuming we do that, counsel, would you agree that the handling of the evidence, the emails, and so on might well still be relevant on the Manuel claims with respect to evaluating Gibson's and Keller's state of mind and intent in particular? I would disagree. I would say that the... And I think that's one of the reasons why we want the record to be clear. We don't want this... The counsel made a lot of ad hominem attacks on Gibson and his motives and all that. That has nothing to do with probable cause. Probable cause is based on the objective evidence. No, that's not the question. But the question is if this is going to trial on the Manuel claims, and it's obviously going to trial on some other claims as well, including those of the kids, that the state of the law about the Brady claims, it seems to me, would not control the relevance of those facts for other purposes in the case. But that's going to be something for Judge Myerscough to deal with in the foreseeable future. Yeah, I apologize. I don't have a clear answer. I'd have to... I can't picture the context in which that would be relevant, but we will have to address that in the trial court. Thank you, counsel. Thank you. You have a minute if you'd like to use it. Briefly, counsel for Pelley said there was no facts whatsoever on probable cause. And again, I would just reiterate, the facts that had not changed from the very start was Jessica Bowman's report. The time of death did not coincide with the witness statement. She put that in her report. The cause of death was undetermined. She had concerns about the stereotosis of the liver. We had Kurt Loveless's own behavior that went into Gibson's analysis. And we had the statements of Coroner Hamilton at the scene, EMT Ballard at the scene. We had various questions that certainly go into the analysis of probable cause. That in and of itself right there is enough for the low bar of probable cause. So I would just say the record states that and we cited that in our reply brief. Thank you. Thank you, counsel. Thanks to all counsel and the case will be taken under advisement.